**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | |
| **DONUS R. SROUFE,** | : | **NO.   1:11-CR-311-CAP/AJB** |
| | : | |
| **Defendant.** | : | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

Defendant Donus R. Sroufe is charged in a two-count indictment with interference with the administration of the Internal Revenue laws, in violation of 26 U.S.C. § 7212(a) (Count One); and making a false claim for a refund, in violation of 18 U.S.C. § 287 (Count Two). [Doc. 1]. Before the Court are Defendant's motion and perfected motion to suppress statements, [Docs. 17, 20], and a motion to dismiss or for the election of count on the grounds of multiplicity, [Doc. 21]. For the following reasons, the undersigned **RECOMMENDS** that the motions be **DENIED**.

**I.     Motions to Suppress Statements, [Docs. 17, 20]**

**A.     Facts**

The Court held an evidentiary hearing to address Defendant's suppression motions, [Doc. 32 (hereinafter T__)]. The Court makes the following finds of fact.

Sometime prior to June 23, 2009, Internal Revenue Service ("IRS") Special Agents Elizabeth Parrino and Joel Ernst went to Defendant's home in an attempt to interview him, but no one answered the door. T5, 26. Parrino left her business card with a request for Defendant to call her back, which he did later that day. T5, 26-27; Gov't Exh. 1. Sroufe and Parrino scheduled June 23, 2009, at Sroufe's home as the date and place of the interview. T5-7, 26-27. Parrino did not tell Sroufe what the purpose of the interview was, because she is wary of giving out information over the telephone when she is unsure of exactly with whom she is conversing. T27.

On June 23, Ernst and Parrino arrived at Sroufe's home around 3:20 pm, slightly later than the agreed-to time because Parrino needed to copy documents for the interview. T7, 28. They arrived in an unmarked government car. T7, 28. They were both wearing plainclothes business attire. T7, 28. They were armed, but their weapons were concealed by clothing and were not intentionally displayed, even if they could have been viewed as the agents moved about during their interview. T8, 19, 38, 43-44.

Defendant's wife, Linda Sroufe, answered the door, stated that "This is a house of peace," and welcomed the agents in. T8, 28. The agents were escorted into the living room. T9. Defendant quickly joined them. T18, 29. The agents displayed their credentials to both Defendant and his wife, who inspected them. T8, 29-30. The

credentials identified the agents as IRS special agents and part of the Criminal Investigations Division. T9, 30. Ms. Sroufe asked for their badge numbers, and in displaying them, the agents asked for Defendant's driver's license so they could positively identify him. T9, 31. Defendant showed his license to the agents and reviewed the agents' credentials. T9-10, 30-31. Parrino stated they were there to interview him. T37.

Defendant consented to having Ms. Sroufe and their fifteen-year-old son, Daniel, present during the interview, despite the discussion of confidential financial information. T10, 12, 31. During the encounter, the agents did not touch, pat down or search any of the Sroufes. T50.

The agents and the Sroufes were seated in the living room. T12. Defendant was in a chair and closest to Ernst, who was approximately six feet away. T22. Ms. Sroufe sat next to Defendant, and their son sat somewhat back from where the interview was conducted. T32. Parrino sat on a couch by herself. T32. The Sroufes were closest to the exit from the living room. T16, 38.

AO 72A
(Rev.8/8
2)

Parrino advised Defendant of his non-custodial rights and advised him that he could end the interview at any time. T10-11, 12-13, 34-35, 36; Gov't Exh. 2.[1] Defendant stated that he understood his rights. T13, 36.

The interview lasted about two hours, with no breaks. T14, 38. None of the Sroufes asked for a break, nor did the agents perform any protective sweep of the residence. T14, 38. At no time were the Sroufes restrained. T16, 40.

The agents' tone of voice was civil and not raised, and they did not make any promises or threats to get Defendant to answer questions. T14-15, 40, 46. Both agents asked questions, although Parrino asked the bulk of them. T17. Defendant's demeanor was pleasant and calm, although the agents thought some of his answers were evasive.

---

[1]    The "Non-Custody Statement of Rights" were as follows:

As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses. In connection with my investigation of your tax liability [(or other matter)], I would like to ask you some questions. However, first I advise you that under the 5th Amendment to the Constitution of the U.S., I cannot compel you to answer any questions or submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of any attorney before responding. Do you understand these rights.

Gov't Exh. 2; T34-35. Parrino omitted the bracketed matter. T35.

AO 72A
(Rev.8/8
2)

T15-16, 39-40.[2]  Parrino asked him about various tax returns in question.  T21.  At times, the agents stood to hand documents to Defendant.  T23.  Early in the interview, Parrino asked Sroufe to join her on the couch in order to look at the documents, which he did before returning to his seat.  T32-34, 44.

At some point during the interview, Ernst suggested that Defendant was running a Ponzi scheme, T44, 45, but Defendant responded that he was not because in a Ponzi scheme there is trouble paying the people back.  T49.  He also told Defendant that if his case was put before a jury whose members paid their taxes, "it wouldn't look good," T45, but Defendant responded that he would try his case before a judge who understood U.C.C. codes.  T49.  When Defendant was told by the agents that it looked like he was involved in illegal activity, he replied that "I can see why it appears that way."  T46, 49-50.[3]  During the interview, Defendant remained calm and did not seek to terminate the interview.  T50.

_____

[2]     The example of evasion given by the agents was that when asked to identify a particular deposit ticket, Defendant's response was that it resembled a deposit ticket.  T16, 40.

[3]     In November 2009, Defendant wrote Parrino and purported to withdraw his statements made in June 2009.  Def. Exh. 1; T47-48.  As the Court ruled at the evidentiary hearing, the letter does not bear on the voluntariness of his prior statements.  T48.

AO 72A
(Rev.8/8
2)

At the end of the interview, Defendant told the agents that he did not want to go to jail. T16, 40. (There was no discussion, one way or another, as to whether Defendant was under arrest or would be arrested. T51). Ms. Sroufe asked the agents what they were supposed to do at this point. T21. The agents served Defendant and Ms. Sroufe with administrative summonses, including one for his handwriting exemplar and one related to one of her businesses. T41, 52. Defendant provided them with his phone number and e-mail address. T40. The agents then left. T40.

Later that evening, Parrino telephoned Defendant. She told him she had additional questions, but also advised him that (1) the earlier rights were still in effect, (2) he did not have to talk to her, and (3) she could read the rights to him again. Defendant replied that was not necessary. T41. He then responded to her follow-up questions. T42.

## B.     Contentions of the Parties

Defendant alleges that he was unlawfully seized and thus he was in custody. He contends that because the agents were present in his home with weapons accessible and visible and made aggressive statements—including accusing him a committing crimes—while questioning him, a reasonable person in his position would not have felt free to leave or terminate the encounter. As a result, he contends he was entitled to

6

AO 72A
(Rev.8/8
2)

*Miranda* warnings, but the warnings provided by Parrino were incomplete because, among other things, they did not advise him that he had a right to have a lawyer present during questioning, only that he could consult with a lawyer before he was questioned. [Doc. 33 at 4-8].

The government responds that Defendant was not in custody for *Miranda* purposes.[4] It argues that even if a reasonable person would not have felt free to leave, that does not satisfy the custody-for-purposes-of-*Miranda* test, which is a formal arrest or restraint on a person's freedom of movement of the degree associated with a formal arrest. [Doc. 36 at 6]. It argues that Defendant has not met his burden of showing under the totality of the circumstances that the encounter was a *de facto* custody situation requiring full-blown *Miranda* warnings. [*Id.* at 7-8]. It also argues Defendant's statements were otherwise voluntary. [*Id.* at 8-10].

## C. Discussion

### 1. The agents' entry into Defendant's home was consensual

The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

---

[4] Although the Court announced at the hearing that no briefing was needed on the issue, T53, the government also addressed the consensual nature of the agents' entry into the Sroufe home, [Doc. 36 at 5].

shall not be violated . . . ." U.S. Const. amend. IV. Warrantless entries by law enforcement into a person's home are presumptively unreasonable. *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). The prohibition does not apply, however, to situations in which voluntary consent has been obtained . . . from the individual [into] whose property" law enforcement enters. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted) (consent to search); *United States v. Maddox*, 316 Fed. Appx. 908, 912-13 (11th Cir. Feb. 27, 2009) (entry and initial search). The government bears the burden of proving the existence of valid consent that is given freely and voluntarily. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).[5]

"[T]he question whether a consent . . . was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Tovar-Rico,* 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors

---

[5] In its initial reply to Defendant's motion, the government also argued that the agents conducted a permissible "knock-and-talk." [Doc. 23 at 2-3]. However, whether the "knock-and-talk" was permissible does not resolve whether the agents' ultimate entry into Defendant's home was permissible.

AO 72A
(Rev.8/8
2)

properly considered in totality-of-circumstances inquiry), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).  The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.  *United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004); *Blake*, 888 F.2d at 798-89.  However, the failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent.  *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).  Consent is voluntary "if it is the product of an essentially free and unconstrained choice." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (internal quotation marks omitted); *Gonzalez*, 71 F.3d at 829.  Also, an individual's failure to object to entry is not the equivalent of consent.  *Id.* at 829-30.

AO 72A
(Rev.8/8
2)

In this case, although it was Ms. Sroufe who allowed the agents to enter the home,[6] the facts demonstrate that the Sroufes' consent to the agents' entry into their residence was consensual and not "prompted by a show of official authority." *Compare United States v. Edmondson*, 791 F.2d 1512, 1514-15 (11th Cir.1986) (no consensual entry shown where agent yelled, "FBI. Open the door," and defendant opened the door, stepped back, and placed his hands upon his head); *Gonzalez*, 71 F.3d at 829-30 (consent to enter could not be inferred where woman refused officer permission to enter and search her home, and officer simply followed her inside as she went to get a glass of water); and *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1326, 1328 (11th Cir. 2006) (consensual entry not shown where officer just followed occupant into the kitchen from the carport); *with United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (voluntary consent implied from defendant's body language when, in

---

[6] "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. . . . Common authority is based upon mutual use of property by persons generally having joint access or control." *United States v. Aghedo*, 159 F.3d 308, 310 (11th Cir. 1998) (citations omitted). A "warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." *United States v. Fernandez*, 58 F.3d 593, 597 (11th Cir. 1995); *see also United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997). No issue has been raised that Ms. Sroufe was not authorized to allow the agents to enter the residence.

AO 72A
(Rev.8/8
2)

response to the officers' requests for admittance, defendant "yield[ed] the right-of-way" to the officers by opening the door and stepping aside); *Holmes v. Kucynda*, 321 F.3d 1069, 1078-79 (11th Cir. 2003) (finding consent to enter where, upon officers' request to enter, individual stepped back allowing entry); *United States v. Stiner*, 551 F. Supp. 2d 1350, 1357 (M.D. Fla. 2008) (finding that stepping aside and pointing at defendant was indicative of yielding the right of way).[7] Here, Defendant called back Parrino after she had left her business card at his home, and during that ensuing conversation, they made arrangements to meet at the Sroufe home on the afternoon of June 23, 2009. When the agents knocked on the door, Ms. Sroufe answered it, told the agents that her home was "a house of peace" and invited them in. They were then escorted into the living room. Either in the foyer or in the living room, the agents displayed their credentials, were asked for their badge numbers by Ms. Sroufe, and asked for Defendant's driver's license.

---

[7] The Eleventh Circuit has agreed with the Ninth Circuit that "whatever relevance the implied consent doctrine[, *i.e.*, consent by silence,] may have in other contexts, it is inappropriate to 'sanction[ ] entry into the home based upon inferred consent.' " *Gonzalez*, 71 F.3d at 830 (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)). However, "body language can indicate implied or tacit consent to a search." *United States v. Reynolds*, 526 F. Supp. 2d 1330, 1337 (N.D. Ga. 2007) (Martin, J.) (citing *United States v. Chrispin*, 181 Fed. Appx. 935, 939 (11th Cir. May 26, 2006)).

AO 72A
(Rev.8/8
2)

Although not all of the factors were addressed by the evidence, at least as of the time of the entry, neither Defendant nor his spouse was in custody or detained. The agents engaged in no coercive procedures to obtain entry, since Defendant had agreed to the meeting even if he was not told of its purpose, and the agents showed up at or about the time that the meeting was scheduled. Both Defendant's agreement to meet and Ms. Sroufe's action in allowing the agents to enter the residence demonstrates their desire to cooperate with the agents. In addition, although he joined the others after the entry, the Sroufes' allowing their fifteen-year-old son to be present adds to the consensual atmosphere because it is unlikely that they would have voluntarily exposed their child to a coercive environment. Although there is no evidence as to either of the adult Sroufes' education levels or intelligence, the evidence does not support a finding that they lacked education or intelligence. As to Ms. Sroufe, she asked for the agents' badge numbers and one of the administrative summonses served on the date of the interviews was for a business of hers. As a result, the record amply demonstrates that she was of an educational and intelligence level sufficient to voluntary choose to let the agents enter her house. As to Defendant, he returned Parrino's call and agreed to meet with her. At the interview, stated that he understood Parrino's recitation of the non-custodial warnings, and engaged the agents in responses to their accusations of his

AO 72A
(Rev.8/8
2)

wrongdoing in a coherent and relevant way.  Thus the Court finds he was intelligent enough to make a voluntary choice to let the agents into his house.

Further, that neither of Defendant nor Ms. Sroufe were told they had a right to refuse to let the agents enter their home is not dispositive.  *Purcell*, 236 F.3d at 1281.  His willingness to speak with the agents suggests a belief that nothing incriminating would result from letting the agents into his home and speaking to them.

Thus, the agents' entry into the home was precipitated by voluntary consent.

## 2.    Defendant was not subjected to a custodial interrogation

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the scope of the Fifth Amendment privilege against self-incrimination and held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444.   Thus, the entitlement to *Miranda* warnings attaches only "when custodial interrogation begins."  *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  Defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a

13

confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.")[8]; *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984) (same), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988).

Contrary to Defendant's argument, the Eleventh Circuit has explained that although a reasonable person in Defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been "seized" by law enforcement—he will not necessarily be considered "in custody" for Fifth Amendment or *Miranda* purposes. *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (citing *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006)). The *Luna-Encinas* Court noted that "a free-to-leave inquiry reveals *only* whether the person questioned was seized." *Luna-Encinas*, 603 F.3d at 881 (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)) (emphasis in original). Instead, an individual is considered to be "in custody" for purposes of receiving *Miranda*'s protections where "there is a formal

---

[8]    In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted); *see also United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) ("[T]he ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.' ") (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)). The *Luna-Encinas* Court framed the test as follows:

> In assessing whether a reasonable innocent person in [the defendant's] position "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest," *Newton*, 369 F.3d at 672,[ ] we consider the totality of the circumstances, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *Street*, 472 F.3d at 1309 (citation and quotation marks omitted), as well as the location and length of the detention, *see, e.g., United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (location); *United States v. Medina-Villa*, 567 F.3d 507, 519 (9th Cir. 2009) (duration).

*Luna-Encinas*, 603 F.3d at 881 (footnote omitted). The test is based on "an objective, reasonable man standard . . . because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.' " *Phillips*, 812 F.2d at 1359-60 (quoting *Berkemer v.*

15

*McCarty*, 468 U.S. 420, 442 n.35 (1984)) (quotation marks altered). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *Luna-Encinas*, 603 F.3d at 881 n.7 (quoting *Street*, 472 F.3d at 1309, and *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996), and citing *Florida v. Bostick*, 501 U.S. 429, 437-38 (1991)).

Defendant has failed to satisfy his burden on this issue. The agents did not brandish their weapons, and the mere fact that the firearms "possibly" could have been displayed in their holsters under their clothing when the agents moved about is insufficient to favor a finding of custody for *Miranda* purposes. Moreover, the agents did not touch Defendant or any member of his family, whether by search, pat down or other physical action denoting compulsion or authority.

Further, while the agents made accusatory statements to Defendant about his conduct, these were not sufficient in either language or tone to indicate that cooperation with the agents was compelled. First, Defendant points to only three comments during a two-hour encounter and does not establish when in the interview these statements were made. Thus, he has not shown that either the extent or the timing of these statements rose to the level of compulsion, which would tip the scales from a non-custodial interview to a custodial one. *Cf.* 2 Wayne R. LaFave et al., *Criminal*

16

*Procedure* § 6.6(f) (3d ed. Nov. 2011) ("[S]urely a reasonable person would conclude he was in custody if the interrogation is close and persistent, involving . . . the discounting of the suspect's denials.").  Second, even if accusatory questioning could render an interview custodial,[9] Defendant did not demonstrate that as part of their questioning, the agents repeatedly accused him of lying.  *See United States v. Lanni*, 951 F.2d 440, 443 (1st Cir. 1991) (weighing agent's expression of disbelief at suspect's profession of innocence in favor of custody); *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (holding that agents had placed defendant in custody by, among other actions, "accusing [him] repeatedly of lying" and "insisting on the 'truth' until he told them what they sought").  Thus, simply because the agents accused Sroufe of criminal conduct did not establish the necessary coercion to constitute custody or a

---

[9]     *But see Stansbury v. California*, 511 U.S. 318, 325 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) ("Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' "); *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) (noting that it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning").

AO 72A
(Rev.8/8
2)

formal arrest. *See United States v. Manor*, 936 F.2d 1238, 1241 (11th Cir. 1991) ("*Miranda* is not implicated simply because an individual is the subject or target of an investigation.") (citing *Murphy*, 465 U.S. at 431). As the Supreme Court held in *Mathiason*,

> a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect.

*Mathiason,* 429 U.S. at 495.

Third, Parrino advised Sroufe prior to questioning him that she could not compel him to answer questions or provide any documents, and that he could stop the interview at any time, and he acknowledged that he understood those rights. Thus, the agents' questioning did not convert a non-custodial interview into one that was custodial.

Next, it is significant that the interview occurred in Sroufe's home. Although not dispositive, "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's

18

AO 72A
(Rev.8/8
2)

home." *Brown*, 441 F.3d at 1348 (citations omitted and punctuation marks altered). Not only did the interview occur at Sroufe's home, the entire encounter occurred in the presence of Ms. Sroufe and their fifteen-year-old son. *Cf. United States v. Mottl*, 946 F.2d 1366, 1370-71 (8th Cir. 1991) (holding defendant not in custody, *inter alia*, because agents did not dominate the atmosphere or remove family members who might have lent moral support).

Further, the interview was not unduly long. *See Tukes v. Dugger*, 911 F.3d 508, 515-16 (11th Cir. 1990) (defendant not in custody despite two-hour interrogation at police station); *see also Yarborough v. Alvarado*, 541 U.S. 652, 655-58 (2004) (suspect not in custody when suspect's parents brought him to station at detective's request, suspect was interviewed in small room for two hours by one detective, interview was recorded, and detective pressed suspect to reveal details of crime by appealing to his "sense of honesty"); *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (interview of two and a half hours was not custodial); *United States v. Jefferson*, 562 F. Supp. 2d 707, 717-18 (E.D. Va. 2008) (holding defendant not "in custody" for *Miranda* purposes when two FBI agents interviewed him for approximately two hours in his home concerning bribery investigation); *Trantham v. Province*, No. CIV 07-156-JHP-KEW, 2010 WL 3734720, at *3

AO 72A
(Rev.8/8
2)

(E.D. Okla. Aug. 2, 2010) (holding defendant not "in custody" at any time when he met officer at a motel, not a police station, for approximately two hours).

Finally, although Sroufe's subjective views of his situation are not relevant, his statement at the end of the interview that he did not want to go to jail is indicative of not being in custody up to that point.  Objectively a suspect cannot be deemed to be "in custody" when the person states, after questioning by the police, that he does not want to go to jail, since a person in custody would not believe that he had that option left to him.

As a result, the Court concludes that the totality of circumstances demonstrate that Sroufe was not in custody during the interview and therefore was not entitled to a full set of *Miranda* warnings.

### 3.    Defendant's statements were voluntary

The Court also concludes that Sroufe's statements were voluntary.  The government bears the burden of showing that Defendant's statements were voluntarily obtained.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.  The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the

product of a free and deliberate choice rather than intimidation, coercion or deception."

*Connelly*, 479 U.S. at 170 (citation omitted). The Court must consider the totality of

the circumstances in assessing whether coercive police conduct was "causally related"

to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This

totality-of-the-circumstances test directs the Court ultimately to determine whether a

defendant's statement was the product of "an essentially free and unconstrained

choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the

factors the Court must consider are the defendant's intelligence, the length of his

detention, the nature of the interrogation, the use of any physical force against him, or

the use of any promises or inducements by police, *see*, *e.g.*, *Schneckloth*, 412 U.S.

at 226; *Gonzalez*, 71 F.3d at 828; and whether the defendant was advised of his

constitutional rights. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318-19 (11th Cir.

2010). However, while the Eleventh Circuit has "enumerated a number of (non-

exclusive) factors that may bear on the issue of voluntariness, the absence of official

coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828

(citations omitted). Sufficiently coercive conduct normally involves subjecting the

accused to an exhaustingly long interrogation, the application of physical force or the

threat to do so, or the making of a promise that induces a confession. *See Connelly*,

21

479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11ᵗʰ Cir. 1984).  Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11ᵗʰ Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11ᵗʰ Cir. 1990), are normally insufficient to preclude free choice.

Many of the same conclusions that dictate a finding that Sroufe was not in custody support the finding that his statements were voluntary.  The record contains sufficient evidence that Sroufe was intelligent enough to make a non-coerced choice whether to provide a statement.  The two-hour questioning was not unduly long or exhausting, and Sroufe did not ask for a break or ever request to stop answering questions.  Although it appears that the questioning became accusatory at times when the agents accused Sroufe of criminal conduct, the questioning was conducted in calm conversational tones, and Sroufe was surrounded by his family in his own home.  Although he was asked on one occasion to sit near Parrino while they reviewed documents, Defendant voluntarily returned to his own seat, and no physical force was used against him or members of his family.  Although the agents made accusations of criminal conduct, no promises or threats were made to Sroufe.  Finally, while Parrino

22

did not provide Sroufe with the full panoply of *Miranda* warnings, she advised him that he did not have to answer questions or provide information, and that he could stop the interview at any time. In short, the record is devoid of any evidence that the agents coerced him in to making a statement.

Therefore, the undersigned **RECOMMENDS** that Sroufe's motion and perfected motion to suppress statements, [Docs. 17, 20], be **DENIED**.

## II. Motion to Dismiss or for the Election of Count, [Doc. 21]

### A. Charges in the Indictment

Count One of the Indictment charges Sroufe with a violation of 26 U.S.C. § 7212(a). [Doc. 1 at 1]. It alleges that he corruptly endeavored to obstruct and impede the due administration of the internal revenue laws by committing certain acts. These acts included (1) filing a 2008 Form 1040 claiming entitlement to a tax refund in the amount of $1,759,476.89; (2) also claiming on the 2008 Form 1040 $2,513,330.01 in income, of which $2.5 million was based on receipt of a United States Treasury bond, and claiming that he paid $2,622,205.84 in federal taxes, when in fact he did not receive such a bond nor did he pay that amount in 2008; (3) after receiving notification from the IRS that his return was frivolous, that he could be fined for filing a frivolous tax return, and that he had thirty days to correct the return, sending a letter

23

to the IRS stating, *inter alia*, that the return was correct; (4) after being told on June 23, 2009, by a Criminal Investigation Special Agent that the Treasury bond listed as income on the 2008 1040 Form appeared to be a fictitious instrument, and knowing at the time that the Form 1040 was false and that he was not entitled to a $1,759,476.89 tax refund, on August 12, 2009, mailing an identical copy of the 2008 Form 1040 to the Secretary of the United States Treasury. [Doc. 1 at 1-3].

Count Two of the Indictment charges Sroufe with violation of 18 U.S.C. § 287. It alleges that on August 12, 2009, he made and presented to the United States Treasury Department a claim for payment of a refund of taxes (contained within a 2008 Form 1040) in the amount of $1,759,476.89, which he knew to be false, fictitious and fraudulent. [Doc. 1 at 3].

## B.    Contentions of the Parties

In this motion, Sroufe claims the two counts in the indictment are multiplicitous because they charge the same crime twice and thus violate the Double Jeopardy Clause of the Fifth Amendment. He argues that he cannot be charged with one count for interfering with the Internal Revenue Service by providing false information and a second, separate count for making a false claim for a refund by providing false

AO 72A
(Rev.8/8
2)

information because the two counts arise from the same singular false statement.  [Doc. 21 at 1-2].

The government opposes the motion, claiming that the charges are not multiplicitous.  It argues that under *Blockburger v. United States*, 284 U.S. 299, 304 (1932), a single act may be prosecuted under two statutes as long as each statute requires proof of a fact that the other does not.  [Doc. 24 at 3].  It further argues that in making this determination, the focus is on the statutory elements of the charges and not on the facts of the case.  [*Id.*].  Applying this precept, the government points to the Eleventh Circuit pattern charges for both of the charges in the indictment and contends that each charge requires proof of a fact not required to obtain a conviction on the other charge.  [*Id.* at 3-4].

## C.    Discussion

An indictment is multiplicitous if it charges the same offense in more than one count.  *United States v. De La Mata*, 266 F.3d 1275, 1288 (11th Cir. 2001); *United States v. Anderson*, 872 F.2d 1508, 1520 (11th Cir. 1989).  When the government charges a defendant in multiplicitous counts, two vices may arise.  First, the defendant may receive multiple sentences for the same offense.  Second, a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has

25

AO 72A
(Rev.8/8
2)

committed several crimes—not one. *United States v. Rahim*, 431 F.3d 753, 758 (11th Cir. 2005) (citing *United States v. Smith*, 231 F.3d 800, 815 (11th Cir. 2000)).

The test for determining whether an indictment is multiplicitous is set forth in *Blockburger*, 284 U.S. at 304: "Whether each provision requires proof of an additional fact which the other did not." *See also United States v. Bonilla*, 579 F.3d 1233, 1242 (11th Cir. 2009). Accordingly, charges in an indictment are not multiplicitous if the charges differ by even a single element or alleged fact. *United States v. Woods*, ---- F.3d ----, ----, 2012 WL 2196179, at *11 (11th Cir. June 18, 2012) (citing *United States v. Costa*, 947 F.2d 919, 926 (11th Cir. 1991)). In the Eleventh Circuit, courts apply the test with a "focus[ ] on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *United States v. Hassoun*, 476 F.3d 1181, 1185 (11th Cir. 2007) (quoting *Albernaz v. United States*, 450 U.S. 333, 338 (1981), and *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)); *see also United States v. Boldin*, 772 F.2d 719, 729 (11th Cir. 1985). The *Hassoun* Court also recognized that

> when comparing charges under different statutory provisions . . . [the court] examine[s] only the elements themselves; if an offense requires proof of an element that the other offense does not, [the court] need look

26

no further in determining that the prosecution of both offenses does not offend the Fifth Amendment. *See, e.g., United States v. Adams*, 1 F.3d 1566, 1574 (11th Cir. 1993); [*United States v.*] *Lanier*, 920 F.2d [887,] 893 [(11th Cir. 1991)]; *Boldin*, 772 F.2d at 726. Specifically, we need not examine the facts alleged in the indictment to support the counts nor the "practical significance" of the theories alleged for each count. *Lanier*, 920 F.2d at 894; *see also Adams*, 1 F.3d at 1574 (holding that the analysis is "applied to the statutory elements underlying each indictment, or count, not to the averments that go beyond the statutory elements"); *Boldin*, 772 F.2d at 726 ("[A] substantial overlap in the proof offered to establish the crimes is not a double jeopardy bar."); *United States v. Mulherin*, 710 F.2d 731, 740 (11th Cir. 1983) ("That much of the same evidence served 'double duty' in proving the two [conspiracy] offenses charged is of no consequence").

*Hassoun*, 476 F.3d at 1186.

A review of the elements of each charge in this case reveals that the charges have different elements and thus the indictment is not multiplicitous. The obstruction/interference charge under § 7212(a) requires the Government to establish that a defendant corruptly obstructed or impeded, or attempted to obstruct or impede, the due administration of the Internal Revenue Code. 26 U.S.C. § 7212(a); *United States v. Popkin*, 943 F.2d 1535, 1535-36 (11th Cir. 1991); *see also United States v. Beiter*, 448 Fed. Appx. 900, 901-02 (11th Cir. Oct. 11, 2011); *United States v. Dean*, 487 F.3d 840, 852 (11th Cir. 2007) (holding that pattern charge accurately conveyed elements of § 7212(a) charge); Eleventh Circuit Pattern Jury Instructions (Criminal),

Offense Instruction 111 (stating, in pertinent part, that a defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt: (1) the defendant knowingly tried to obstruct or impede the due administration of the Internal Revenue laws; and (2) the defendant did so corruptly). A defendant acts "corruptly" if he acts "knowingly and dishonestly with the specific intent to secure an unlawful benefit either for himself or another." *Dean*, 487 F.3d at 853.

On the other hand, the elements of the fraudulent-claim charge under § 287 are that (1) the Defendant knowingly presented a false claim against the United States to an agency of the United States; (2) the claim was based on a false or fraudulent material fact; and (3) the Defendant acted intentionally and knew that the claim was false and fraudulent. Eleventh Circuit Pattern Jury Instructions (Criminal), Offense Instruction 11.2.

Applying the *Blockburger* test as followed by the Eleventh Circuit, it is clear that the government must prove different and additional facts under Count One than it must under Count Two, and vice versa. The *mens rea* element in the § 7212(a) charge, requiring that Defendant act "corruptly," is different than either the "intentionally" element of the § 287 charge. As noted above, a person acts "corruptly" if he acts "knowingly and dishonestly with the specific intent to secure an unlawful benefit either

28

for himself or another," *Dean*, 487 F.3d at 853, while " '[t]o act intentionally means to act deliberately, rather than mistakenly or inadvertently.' " *U.S. S.E.C. v. Weintraub*, No. 11-21549-CIV, 2011 WL 6935280, at *7 (S.D. Fla. Dec. 30, 2011) (quoting *SEC v. Chem. Trust*, No. 00-8015-CIV, 2000 WL 33231600, at *10 (S.D. Fla. Dec.19, 2000).

Conversely, in order to prove the § 287 charge, the government must prove that Defendant's submitted claim was based on a false and fraudulent material fact. There is no requirement that the government prove a false submission with regard to the § 7212(a) charge. *Cf. United States v. Dain*, 258 Fed. Appx. 90, 93 (9th Cir. Nov. 27, 2007) (indictment charging violation of § 7212(a) and filing false tax return in violation of 26 U.S.C. § 7206(1) not multiplicitous because § 7212(a) does not require a false filing).

As a result, the charges are not multiplicitous, and therefore, the undersigned **RECOMMENDS** that Defendant's motion to dismiss or to compel an election, [Doc. 21], be **DENIED**.

29

AO 72A
(Rev.8/8
2)

## III. Conclusion

For all of the above reasons, the undersigned **RECOMMENDS** that Defendant's motions to suppress, [Docs. 17, 20], an motion to dismiss or to compel election, [Doc. 23], be **DENIED**.  The Court has now ruled on all pretrial motions, and has not been advised of any impediment to the scheduling of trial.  Accordingly, this action is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the  16th  day of July, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

30

AO 72A
(Rev.8/8
2)